UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEARGAL MAC CONULADH,            )<br>                                                         )<br>               Plaintiff,                       )<br>                                                         )<br>      vs.                                             )<br>                                                         )<br> ATARI GAMEBOX LLC,                )<br>                                                         )<br>               Defendant.                   )<br>_____ )<br>                                                         )<br>                                                         ) | CIVIL ACTION NO. 1:18-cv-06380<br><br>COMPLAINT FOR BREACH OF<br>CONTRACT, BREACH OF THE<br>COVENANT OF GOOD FAITH AND FAIR<br>DEALING, QUANTUM MERUIT,<br>DECLARATORY RELIEF, AND RECISION |

## **COMPLAINT**

Plaintiff FEARGAL MAC CONULADH ("Plaintiff") alleges for his Complaint against Atari Gamebox, LLC ("Defendant" or "Atari Gamebox") as follows:

### **Introduction**

1. This complaint relates the true facts regarding the efforts of Atari and its CEO and principal owner, Frédéric Chesnais, to steal the ideas, intellectual property, effort, and success of Plaintiff – an experienced and well-regarded executive in the technology industry who approached Atari with a blockbuster of an idea. After initially claiming a desire to work with Plaintiff to realize the vision (and profits for both Plaintiff and Atari), Mr. Chesnais has altered deals, excluded Plaintiff from participation, and refused to pay compensation clearly due, all as part of an effort to arrogate all the fruits of Plaintiff's proposal and hard work to Mr. Chesnais's company. As detailed below, the scheme violates the laws of New York.

## The Parties

2. Plaintiff is and at all relevant times has been a citizen of the Republic of Ireland (only) and a resident of Spain.

3. Atari Gamebox is and at all relevant times has been an LLC corporation organized and existing under the laws of Delaware, with its principal place of business in New York County, New York.

4. The sole member of Atari Gamebox is and at all relevant times has been Atari Games, Corp. (p/k/a Atari Capital Partners) ("Atari Games"), a corporation organized and existing under the laws of Delaware with its principal place of business in New York County, New York.

5. Atari Games is and at all relevant times has been a wholly-owned subsidiary of Atari, S.A. ("Atari S.A."), a corporation organized and existing under French law with its principal place of business in France, the stock of which is traded on the Euronext Paris stock exchange.[1] Defendants, Atari S.A., and other related corporate entities will be described as the "Atari Group".

## Jurisdiction and Venue

6. Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, as it involves parties of diverse citizenship and the amount in controversy, excluding costs and fees, exceeds $75,000.

7. This Court has personal jurisdiction over Defendant, because Defendant performed acts and/or consummated a transaction in this jurisdiction; Defendant purposefully availed themselves of the privilege of conducting business in this jurisdiction and invoked the benefits and protections of the law of this jurisdiction; the claims relate in part to Defendants'

---

[1] A French *Société Anonyme* (abbreviated "S.A.") is essentially analogous to a "corporation" formed under the laws of the various States of the United States.

activities and conduct related to this jurisdiction; Defendant agreed to the jurisdiction of this Court; and the exercise of personal jurisdiction is reasonable.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because the only Defendant resides in this District, and/or 28 U.S.C. § 1391(b)(2), because a substantial part of the acts or omissions giving rise to the claim occurred here.

9. Pursuant to Local Rule18(a), this matter is properly assigned to the Manhattan courthouse.

## Factual Allegations

### The Parties' Backgrounds Prior to the Agreement

10. Plaintiff is a highly-experienced technology executive, having worked in high-level positions at various companies including Apple, Lexmark, Seiko Epson, and Lenovo over the course of a 26-year career.

11. The Atari Group describes itself as a "multi-platform, global interactive entertainment and licensing company" that "owns and/or manages a portfolio of more than 200 games and franchises." Through and into 2017, however, the Atari Group had little to no experience relevant to advanced hardware development; for example, the Atari Group had not developed or brought to market a gaming console for more than 20 years.

12. In early 2017, Plaintiff approached the CEO and principal owner of Atari S.A., Frédéric Chesnais, and proposed to the Atari Group the development and creation of a new Atari-branded gaming console and streaming media player, currently referred to within the Atari Group and the gaming community as the Atari VCS. (Although the project and anticipated product previously had other names, the complaint will use "Atari VCS" rather than any previous names.)

13. Mr. Chesnais was impressed by the idea, and agreed with Plaintiff that a new company would be created to design, develop, and bring the Atari VCS to market; that Plaintiff would be the General Manager of that company and project; and that Plaintiff would own 30% of that company in exchange for his ideas, efforts, and contributions, along with

3

compensation in form of a percentage payment from a planned crowd-funding campaign and a future executive compensation package.

14. Trouble with and broken promises by Mr. Chesnais began almost immediately.

### The Agreement

15. Notwithstanding the May 2017 agreement between Mr. Chesnais and Mr. Mac Conuladh that the ownership of the new entry would be split 70/30, when it came time to formalize the deal, Mr. Chesnais declined to proceed unless Plaintiff agreed to reduce his ownership interest to 25%. In a gesture of good faith and in light of his confidence in the project and his ability to drive it, Plaintiff agreed to the demand.

16. Therefore, on or about July 1, 2017, Atari Games and Plaintiff created Defendant Atari Gamebox as a limited liability company under Delaware law for the purpose of designing, developing, and commercializing the Atari VCS, with Atari Games, Corp. holding a 75% interest and Plaintiff holding a 25% interest. The Managers of Defendant were designated as (1) Frédéric Chesnais, (2) Michael Artz (another high-level Atari Group executive), and (3) Plaintiff.

17. Also on or about July 1, 2017, Atari Gamebox and Plaintiff entered into a *Services Agreement* (the "Services Agreement"). The Services Agreement provided that Plaintiff would act as the General Manager for the Atari VCS, in exchange for (1) his 25% interest in the LLC with certain rights regarding the distribution of funds from the LLC, (2) a distribution of up to $600,000 from revenues obtained through an anticipated crowd-funding campaign, and (3) the possibility of future compensation package comparable to those earned by others in similar positions in the industry. As part of the Services Agreement, Defendant agreed to reimburse Plaintiff's reasonable "[t]ravel and miscellaneous expenses" and to pay the invoices for third parties engaged by Plaintiff to assist in the project for expedience and convenience.

18. The Services Agreement provided that it would be governed by the law of New York and that any lawsuit between Atari Gamebox and Plaintiff would be brought "in New York City".

19. Further, on or about July 12, in exchange for the ideas, efforts, and contributions being made by Plaintiff to its indirectly wholly-owned subsidiary, Atari S.A. issued a Stock Option Grant (signed by Mr. Chesnais) permitting Plaintiff to purchase up to 400,000 shares of Atari S.A. stock, at an exercise price of € 0.28 per share. Under the terms of the Stock Option Grant, 1/3 of those options vested immediately; 1/3 would vest in one year "[s]ubject to [Plaintiff] remaining continuously employed by Atari, and/or its affiliates"; and the remainder would vest after a second year, subject to the same proviso. All vested options could be exercised at any time on or prior to July 12, 2025, and no later than 90 days after termination of employment.

20. In September 2017, Defendant and Mr. Chesnais decided to insist on yet a further alteration of the deal that would strip Plaintiff of his (already reduced) stake in Atari Gamebox. Again as a gesture of good faith, and in light of the Atari Group's superior bargaining power, Plaintiff agreed to Defendant's demand.

21. Therefore, on or about September 30, 2017, Plaintiff and Atari Games entered into an *Amended and Restated Limited Liability Company Agreement of Atari Gamebox, LLC* (the "Second LLC Agreement"), which among other things (1) stripped Plaintiff of his 25% ownership interest, and (2) confirmed the three Managers of Atari Gamebox as Plaintiff, Mr. Chesnais, and Mr. Artz.

22. Shortly thereafter, on or about October 20, 2017, Plaintiff and Atari Gamebox entered into an *Amendment #1 to Services Agreement* (the "Amendment"; along with the Services Agreement, the "Agreement"). As noted above, in connection with entering into the Amendment, Plaintiff (at Defendant's insistence) released his ownership interest in Atari Gamebox as part of the modification of Plaintiff's compensation. After the Amendment, the Agreement instead provided that Plaintiff would be compensated as follows:

(1) Atari Gamebox would pay Plaintiff 4% of all crowdfunding revenues received above $200,000, capped at a total payment of $600,000);

(2) Atari Gamebox would pay Plaintiff 1.5% of all revenue received by Defendant during the period from the end of the crowdfunding campaign through December 31, 2022; and

(3) Atari S.A. would grant stock options for 1,350,000 shares of Atari S.A. stock, at an option price of 80% of the current share value.

23. In connection with the Agreement, Atari S.A. issued a Stock Option Grant (signed by Mr. Chesnais, Atari SA's CEO) permitting Plaintiff to purchase up to 950,000 shares of Atari S.A. stock [supplementing the previous 400,000], at an exercise price of € 0.35 per share.  Under the terms of the Stock Option Grant, 1/3 of those options vested as of the grant date, which was retroactively made July 12, 2017; 1/3 would vest in one year from July 12, 2017, "[s]ubject to [Plaintiff] remaining continuously employed by Atari, and/or its affiliates"; and the remainder would vest after a second year, subject to the same proviso.   All vested options could be exercised at any time on or prior to July 12, 2025, and no later than 90 days after termination of employment.

24. The actual price of Atari S.A. stock on October 20, 2017 was € 0.36, such that the proper exercise price was 80% of that, or € 0.288.  Neither Defendant nor Mr. Chesnais (nor anyone else) ever provided an explanation for the incorrect exercise price, notwithstanding numerous requests and complaints.

25. The Stock Option Grants, signed by the CEO of Atari S.A. and Plaintiff, provide that options "may be exercised in whole or in part by delivering written notice to Atari [S.A.] stating the number of Shares for which the Option is being exercised and the intended manner of payment" and that "[t]he date of such notice shall be the exercise date."

26. Neither Atari S.A. nor the Defendant provided Plaintiff (despite multiple requests) a copy of a putative set of rules governing Atari S.A.'s stock option plan.

27. Notably, other than with respect to the vesting schedule of the Atari S.A. stock options, the compensation promised and agreed to in the Agreement was not contingent upon Plaintiff and Defendant remaining in a working/employment relationship.

The Parties' Subsequent Conduct

28. Throughout the latter half of 2017, Plaintiff worked (more than) full-time on the Atari VCS project. The bulk of Plaintiff's work, including his most important work, occurred in California, with some time spent in New York meeting with Atari Gamebox's other Managers and other Atari Group personnel, and some work performed at or near Plaintiff's home in Spain.

29. For example, Plaintiff spent considerable time in California meeting, negotiating with, and managing multiple partners and team members, as well as sourcing, securing, and managing the activities of critical project partners covering the wide spectrum of disciplines necessary to bring the Atari VCS to market (underscoring the value of Plaintiff's time and expertise). Critical partners with whom Plaintiff met in California included without limitation Flextronics, AMD, Intel, Qualcomm, Compal, MSI, Activision, Blizzard, Amazon, various other gaming content companies, Surface, Inc., Ammunition, various contractors that became *de facto* members of the team, Glass & Marker, Rain Factory, Kickstarter, and Indiegogo, in addition to critical meetings at leading industry events in San Francisco (GDC) and Los Angeles (E3).

30. Overall, in the course of his duties as General Manager, Plaintiff performed the following tasks (among others):

* Sourcing, securing, negotiating agreements with, and working with industry partners necessary for the project, including leading companies such as Flextronics, AMD, Intel, Qualcomm, Compal Electronics, and Micro-Star International;

* Sourcing, securing, negotiating agreements with, and working with various content and distribution providers, including leading companies such as Activision, Blizzard, and Amazon;

> \*      Sourcing, securing, negotiating agreements with, and working with design partners, engineering partners, contractors, press, and crowdfunding platforms;
>
> \*      Overseeing the design and initial technical development of the Atari VCS in a remarkably short period of time at a remarkably low cost;
>
> \*      Sourcing, securing, and negotiating agreements with peripheral companies (including DreamGear in Los Angeles and TACT PD in Palo Alto) to partner with Atari on development of accessory products, with creative business arrangements given that Atari did not want to make specific development investments in these accessory products;
>
> \*      Meeting with marketing partners, crafting the marketing strategy, personally implementing email and social media campaigns that lead to a qualified email database specific to Atari VCS that held approximately 120,000 emails, and action instrumental to Atari Gamebox securing more than $2 million in funding with the first 48 hours of the beginning of its crowdfunding campaign;
>
> \*      Working with partners such as Glass & Marker in extreme detail on the development of marketing assets, including for example the video used in the crowdfunding campaign (indeed, with the exception of Defendant's removal of the portions of the video materials in which Plaintiff was on screen, virtually all of the final video is Plaintiff's work);
>
> \*      Attending key industry conferences including GDC in San Francisco, E3 in Los Angeles, and CES in Las Vegas; and
>
> \*      Meeting with, managing, reporting to, and taking direction from multiple team members and senior personnel at Atari Gamebox and within the Atari Group.

31.     In short, Plaintiff preformed all of his obligations under the Agreement, and then some.

32.     Plaintiff's active relationship with Atari Gamebox continued into January 2018. For example, at Defendant's request, Plaintiff attended the January 9-12, 2018 Consumer Electronics Show in Las Vegas, where he arranged, attended, and chaired meetings with key partners, and generally promoted the Atari VCS, all at the direction of Defendant and all while being presented to world as the project lead on and General Manager for the Atari VCS. Furthermore, Plaintiff continued to demonstrate incredible goodwill and support to the Atari Gamebox team on regular basis, right up to the eventual crowdfunding launch on May 20, 2018, including by providing advice, answering questions, spending considerable time transferring

8

massive amounts of project data to newly-appointed team members, assisting in the transfer of digital assets, and more.

33. Notwithstanding Plaintiff's remarkable success in moving the project along, Atari Games, purporting to act as the "Founder" pursuant to the LLC Agreement, purported to terminate Atari Gamebox's relationship with Plaintiff on or about January 26, 2018.

34. That purported termination was of no legal effect because the LLC Agreement provides that a Manager "may not be removed without cause" as provided in Section 6.3(c) of the LLC Agreement, and there was no cause for such removal (indeed, not such "cause" was even suggested). Plaintiff therefore remains "employed" by the Atari Group to this day.

35. It did have a practical effect, however, in that Defendant effectively shut Plaintiff out of the management and development of the project and the Atari VCS. In the absence of Plaintiff's expert and experienced leadership and excellent relationships with key players in the industry, the project has fallen further behind schedule and failed to perform nearly as well as it would have absent Defendant's wrongful conduct.

36. Defendant began the crowdfunding campaign contemplated by the Agreement (using Indiegogo) on or about May 30, 2018, and completed the campaign on or about June 30, 2018. According to published reports, it appears the campaign raised approximately $3 million, a mere fraction of what it would have raised with Plaintiff's continued leadership.

### Defendant's Subsequent Continuing Refusal To Comply with the Agreement

37. Notwithstanding Plaintiff's fulfillment of all of his obligations in the Agreement, and the enormous amount of work Plaintiff did on Defendant's behalf, and the great progress Plaintiff achieved for Defendant, Defendant has refused to comply with its obligations under the Agreement.

38. First, Defendant has refused to pay Mr. Mac Conuladh the amounts due because of the Indiegogo crowdfunding campaign, which success was only possible because of

Plaintiff's hard work, skill, and dedication. The crowdfunding campaign generated approximately $3 million, which means the amount due to Plaintiff is approximately $112,000.

39. Absent Defendant's wrongful exclusion of Plaintiff from leadership of the project, the Indiegogo campaign could have raised considerably more funds, thus potentially entitling Plaintiff to the full $600,000 payment contemplated in the Agreement.

40. Second, Atari Gamebox has announced that it will refuse to pay Plaintiff the 1.5% of Defendant's net revenue from the period July 1, 2018 (the first day after the end of the Indiegogo campaign) through December 31, 2022, as required by the Agreement. The amount of such revenue is of course currently not yet known, but projections by Defendant suggest that it will be hundreds of millions of dollars, meaning the amount due but unpaid to Plaintiff will be several million dollars.

41. Third, Atari Gamebox has wrongfully failed to cause its affiliate Atari S.A. to issue stock to Plaintiff despite his proper exercise of the stock options pursuant to the Stock Option Grants, and Atari S.A. has wrongfully failed to issue stock to Plaintiff despite his proper exercise of the stock options pursuant to the Stock Option Grants. In particular, Plaintiff on February 13 (well within the 90-day window that began, if it ever did, on January 26) provided written notice of his intent to exercise and stated that the payment would be made by bank transfer, thus fulfilling his exercise obligations imposed by the Stock Option Grants. Nonetheless, Plaintiff was not issued the 450,000 shares of stock, which could have been sold for a profit of € 297,700 (approximately $370,000) in February 2018, based on the proper exercise price of € 0.288 and Atari's February high stock price of € 0.95.

42. Fourth, Atari Gamebox has announced that it will not cause its affiliate Atari S.A. to comply with its obligations under the Stock Option Grants with respect to the remaining 2/3 of Plaintiff's stock options, on the incorrect basis that Plaintiff is no longer "employed" by Atari Gamebox.

43. Fifth, Atari Gamebox has refused to reimburse Plaintiff more than $7,000 in expenses for which he is entitled to reimbursement under the Agreement, notwithstanding near

a dozen requests for such reimbursement and Atari Gamebox's "we will look into it"-type promises. This is similar to Atari Gamebox's refusal to pay the full amounts owed by Atari Gamebox to third-party contractors – with Mr. Chesnais withholding payment of the amounts due simply because he knew they did not have the resources to seek full recovery in court.

### First Cause of Action – Breach of Contract

44. Plaintiff re-alleges and incorporates herein all preceding paragraphs.

45. The Agreement is a valid written contract, properly executed by Plaintiff and Defendant.

46. Plaintiff has fulfilled all of his obligations under the Agreement, other than those (if any) that he was excused from performing.

47. Defendant breached the Agreement, as detailed above, both by refusing to comply with its current obligations and by announcing its intention to refuse to comply with its future obligations.

48. As a consequence of Defendant's breaches of the Agreement, Plaintiff has suffered damages in an amount to be proven at trial, reasonably estimated to be several million dollars.

### Second Cause of Action – Breach of Covenant of Good Faith and Fair Dealing

49. Plaintiff re-alleges and incorporates herein all preceding paragraphs.

50. As part of its obligations under the Agreement and in consideration of the consideration accepted from Plaintiff, Defendant agreed to act in good faith and to deal fairly with Plaintiff in connection with both parties receiving the benefits of the Agreement.

51. Defendant nevertheless refused and failed to act in good faith and deal fairly with Plaintiff, and breached those obligations to Plaintiff, including without limitation by acting to further its own economic interest at the expense of Plaintiff's and by refusing to allow Plaintiff's continued leadership of the Atari VCS project and thereby harming the Indiegogo crowdfunding campaign.

52. As a consequence of Defendant's wrongful conduct, Plaintiff has suffered damages in an amount to be proven at trial, reasonably estimated to be several million dollars.

### Third Cause of Action – Quantum Meruit

53. Plaintiff re-alleges and incorporates herein all preceding paragraphs.

54. Plaintiff performed services of value for Defendant, at Defendant's request.

55. Defendant knowingly and intentionally accepted the value of those services.

56. Both parties understood that Plaintiff was entitled to receive compensation for the value of those services.

57. Defendant has wrongfully refused to provide such compensation to Plaintiff.

58. As a consequence of Defendant's wrongful conduct, Plaintiff has suffered damages in an amount to be proven at trial, reasonably estimated to be several million dollars.

### Fourth Cause of Action – Declaratory Judgment

59. Plaintiff re-alleges and incorporates herein all preceding paragraphs.

60. A real and justiciable controversy exists between the parties regarding Plaintiff's future entitlement to 1.5% of Defendant's revenue during the period July 1, 2018 through December 31, 2022 and Plaintiff's future entitlement to vesting of the remaining 900,000 stock options.

61. In light of the current uncertainty regarding the future value of those rights, the parties are entitled to resolution of the dispute and entry of a judgment adjudicating Plaintiff's rights (or lack of rights) to that future compensation.

### Fifth Cause of Action – Rescission

62. Plaintiff re-alleges and incorporates herein all preceding paragraphs.

63. In the alternative, due to the failure of consideration, an inability to perform the Agreement caused by Defendant's conduct, and/or Defendant's breach of the

Agreement that substantially defeats the purpose of the Agreement, Plaintiff is entitled to rescission of the Agreement, including without limitation with respect to any purported assignment of Plaintiff's intellectual property rights related to the Atari VCS.

64. In the absence of the Agreement, Plaintiff possesses intellectual property rights in technology, writings, marks, and other content that he managed, developed, and created in connection with the Atari VCS project.

## **PRAYER**

Wherefore, Plaintiff prays judgment against Defendant as follows:

1. for compensatory damages in an amount to be determined at trial;
2. for declaratory relief as described above;
3. for an order declaring Plaintiff the owner of all intellectual property associated with the Atari VCS project;
4. for prejudgment interest as permitted by law;
5. for postjudgment interest as permitted by law;
6. for costs of suit; and
7. for such other relief as the Court may deem proper.

Dated: July 13, 2018

Respectfully submitted,

*s/ Scott R. Raber*_____
Scott R. Raber (SR7534)
scott.raber@rimonlaw.com
Richard J. Mooney (*pro hac vice* anticipated)
richard.mooney@rimonlaw.com
**Rimon Law, P.C.**
One Embarcadero Center, Suite 400
San Francisco, CA 94111
Telephone: (415) 683-4572

*Attorneys for Plaintiff FEARGAL MAC CONULADH*